Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

DEC 2 3 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

---

OMER HARLAND GALLION,

                  Petitioner,

    v.

GEORGE GALAZA, WARDEN,

                  Respondent(s).

CASE NUMBER SA CV00-0491-PA(JWJ)

NOTICE OF FILING OF MAGISTRATE
JUDGE'S REPORT AND RECOMMENDATION

---

TO: ALL PARTIES OF RECORD

C. Roman Rector, Esq.
3102 O Street
Sacramento, CA 95816

Steven D. Matthews, Deputy Attorney General
300 S. Spring Street, Suite 5000

You are hereby notified that pursuant to the Local Rules Governing Duties of Magistrate Judges, the Magistrate Judge's report and recommendation has been filed on December 23, 2003    a copy of which is attached.

Any party having objections to the report and recommendation shall, not later than **January 8, 2004**, file and serve a written statement of objections with points and authorities in support thereof before the Honorable **JEFFREY W. JOHNSON**, U.S. Magistrate Judge.

Failure to so object within the time limit specified shall be deemed a consent to any proposed findings of fact. Upon receipt of objections, or upon lapse of the time for filing objections, the case will be submitted to the District Judge for disposition. Following entry of judgment and/or order, all motions or other matters in the case will be considered and determined by the District Judge.

The report and recommendation of Magistrate Judge is not a final appealable order. A notice of appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1) should not be filed until entry of a judgment and/or order by the District Judge.

CLERK, UNITED STATES DISTRICT COURT

ENTERED ON ICMS

DEC 2 3 2003

CV

Dated: December 23, 2003
Attachment

By  Amalia Carrillo
     Deputy Clerk

---

M-51(6/98)   NOTICE OF FILING OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

1

2

3

4

5

6



FILED
CLERK, U.S DISTRICT COURT

DEC 2 3 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

7

8

9

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

10

11

12

13

14

15

16

| | |
|---|---|
| OMER HARLAND GALLION,<br><br>Petitioner,<br><br>vs.<br><br>GEORGE GALAZA, Warden,<br><br>Respondent. | Case No. SACV 00-491-PA (JWJ)<br><br>REPORT AND<br>RECOMMENDATION<br>OF UNITED STATES<br>MAGISTRATE JUDGE |

17

18

19

20

21

22

23

This Report and Recommendation is submitted to the Honorable Percy Anderson, United States District Judge, by United States Magistrate Judge Jeffrey W. Johnson, pursuant to 28 U.S.C. § 636 and General Order 01-13 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the district court grant petitioner a conditional Writ of Habeas Corpus.

24

25

26

# I.

# SUMMARY OF PROCEEDINGS

27

28

On August 16, 1995, in Los Angeles Superior Court case no. LA 020353, petitioner Omer Harland Gallion was convicted of first-degree murder in

1   violation of California Penal Code section 187(a).  (Reporter's Transcript
2   ("RT") 349; Clerk's Transcript ("CT") 112-13.)  Petitioner was sentenced to
3   state prison for a term of life with the possibility of parole.  (RT 356; CT 114,
4   119.)

5          On March 26, 1997, the California Court of Appeal affirmed petitioner's
6   conviction in its entirety.  (Petition, Exh. A.)  Most of the opinion addressed
7   the admissibility of evidence that petitioner physically, emotionally, and
8   sexually abused his daughters.  (<u>Id.</u> at 5-10.)  The court also addressed whether
9   trial counsel's failure to object to the prosecutor's questions seeking character
10  evidence during the cross-examination of petitioner constituted ineffective
11  assistance of counsel.  (<u>Id.</u> at 10-14.)

12         On March 21, 1997, petitioner filed in the California Court of Appeal a
13  petition for writ of habeas corpus, which the court denied on May 22, 1997.
14  (Motion to Dismiss, p. 1.)  On May 5, 1997, petitioner filed in the California
15  Supreme Court, a petition for review, which the court denied on July 9, 1997.
16  (<u>Id.</u>)  On May 30, 1997, petitioner filed a petition for writ of habeas corpus in
17  the California Supreme Court; the court denied the petition on April 15, 1998.
18  (<u>Id.</u>)

19         On November 25, 1998, petitioner filed the present Petition for Writ of
20  Habeas Corpus by a Person in State Custody (28 U.S.C. § 2254).  This Court
21  denied Respondent's Motion to Dismiss the Petition as unexhausted and
22  ordered respondent warden to file an Answer to the Petition, which he did on
23  March 30, 1999.  Petitioner filed a Traverse to the Answer on April 20, 1999.

24         After reviewing the pleadings, this Court conducted an evidentiary
25  hearing on June 19 and 20, 2002.  The parties subsequently filed post-hearing
26  briefs.  This Court now issues its Report and Recommendation.
27  ///
28  ///

## II.

## STANDARD OF REVIEW

The Court reviews the Petition under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.  Under the AEDPA, a federal court shall presume that a determination of factual issues made by a state court is correct, and Petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court has explained the standard of review under the AEDPA as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the

1    Supreme Court's] decisions but unreasonably applies that principle

2    to the facts of the prisoner's case.

3  Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389

4  (2000).  A state court's decision is an "unreasonable application" of Supreme

5  Court precedent if it is "objectively unreasonable," which standard "requires

6  the state court decision to be more than incorrect or erroneous."  Lockyer v.

7  Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1174, 155 L. Ed. 2d 144 (2003);

8  Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1169-70 (9th Cir. 2003).  Thus, "an

9  unreasonable application is different from an incorrect one."  Bell v. Cone, 535

10  U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002); accord Price

11  v. Vincent, __ U.S. __, 123 S. Ct. 1848, 1854-55, 155 L. Ed. 2d 877 (2003)

12  (even where a reviewing court might find that error occurred, habeas relief is

13  not warranted where state court denial of claim is "at least reasonable").

14    Under the AEDPA, circuit law may be "persuasive authority for purposes

15  of determining whether a particular state court decision is an 'unreasonable

16  application' of Supreme Court law."  Davis v. Woodford, 333 F.3d 982, 990-

17  91 (9th Cir. 2003).  However, only the Supreme Court's holdings need be

18  reasonably applied by the state courts under the AEDPA.  Andrade, 123 S. Ct.

19  at 1172.

20    In reviewing a habeas petition, the Court will examine a reasoned

21  California Court of Appeal opinion under the AEDPA where the California

22  Supreme Court opinion denies the same claims without discussion because

23  "where there has been one reasoned state court judgment rejecting a federal

24  claim, [federal habeas courts should presume that] later unexplained orders

25  upholding that judgment or rejecting the same claim rest upon the same

26  ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed.

27  2d 706 (1991); see also Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th

28  Cir. 2000) (noting that habeas courts "look through" unexplained denial by the

- 4 -

1   California Supreme Court to review explicated California Court of Appeal

2   opinion), cert. denied, 534 U.S. 944, 122 S. Ct. 324, 151 L. Ed. 2d 242

3   (2001).

4        If there is no reasoned decision by a California state court, this Court

5   conducts an independent review of the record to determine the reasonableness

6   under the AEDPA standard of the state court's denial of petitioner's claims.

7   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Thomas v. Hubbard, 273

8   F.3d 1164, 1170 (9th Cir. 2001); see also Wiggins v. Smith, ___ U.S. ___, 123

9   S. Ct. 2527, 2542, 2543, 156 L. Ed. 2d 471 (2003) (where there is no state

10  court conclusion as to prejudice, the federal court "evaluate[s] the totality of

11  the evidence – 'both that adduced at trial, and the evidence adduced in the

12  habeas proceeding[s].'") (emphasis original).  In conducting this review, a

13  federal court must still focus primarily on Supreme Court cases in deciding

14  whether the state court's resolution of the case constituted an objectively

15  unreasonable application of clearly established federal law.  Thomas, 273 F.3d

16  at 1170.  If the state court decision is not the result of an objectively

17  unreasonable application of clearly established federal law, "the deference

18  [federal courts] owe state court decisions dictates a denial of habeas relief, even

19  when [the federal court] conclude[s] that a legal error has been committed."

20  Delgado, 223 F.3d at 981.

21       Petitioner's direct appeal to the California Court of Appeal alleged only

22  two instances of ineffective assistance of counsel – failure to object to the

23  prosecution's questions seeking evidence of character and prior bad acts during

24  petitioner's cross-examination.  These claims are reviewed under the highly

25  deferential standard set forth in 28 U.S.C. § 2254(d).  Petitioner's additional

26  assertions of ineffective assistance of counsel, prosecutorial misconduct and

27  new evidence presented herein, were raised exclusively before the California

28  Supreme Court on habeas review.  The California Supreme Court rejected that

- 5 -

petition without comment. As to these claims, this Court has conducted an independent review of the record to determine whether the California Supreme Court applied the governing legal standard in an unreasonable manner, that is, whether the California Supreme Court's denial of habeas relief was objectively unreasonable.

### III.
### PETITIONER'S CLAIMS

Petitioner alleges that his constitutional rights were violated in the following three manners:

a.   Petitioner received ineffective assistance of trial counsel in numerous instances;

b.   The prosecutor committed misconduct which denied petitioner a fair trial;

c.   New evidence undermines confidence in the correctness of petitioner's conviction.

(Petition, pp. 6-7.)

### IV.
### FACTUAL BACKGROUND

Petitioner was convicted, in a 1995 trial, of murdering his mother-in-law, Catherine Halgren, on September 15, 1972. In 1972, petitioner had been married to his wife Ramona for twenty-five years. (Pet. Exh. B – 1972 Police Report, p. 15.) Three daughters, Linda, Catherine Marie, and Robin, were born to the union. (RT 62; Pet. Exh. A, p. 2.)

///
///
///

**A.     The 1972 Murder and Investigation**

The 1972 police investigation revealed the following (much of which was presented as prosecution evidence at petitioner's 1995 trial): Halgren got along well with her daughter Ramona and her granddaughters, but not with petitioner. (RT 63; Pet. Exh. A, p. 2.) Even so, petitioner visited Halgren on many occasions and often attended family gatherings with her. (See RT 63, 127-28.) Halgren and petitioner frequently argued about whether petitioner was adequately supporting his wife and children. (Pet. Exh. B – 1972 Police Report, p. 15.) Halgren thought petitioner shiftless and lazy; however, she gave money to petitioner on occasion. (Id.; Pet. Exh. A, p. 2.)

Petitioner's brother Marvin testified in 1995 that on September 15, 1972, petitioner asked Marvin to accompany him to a club in Norwalk to hear a country music band. (RT 121; Pet. Exh. B – 1972 Police Report, p. 17.) At about 9:00 p.m., almost immediately after the band began playing, petitioner left the club while Marvin remained. (RT 125; Pet. Exh. A, p. 2.) Petitioner returned an hour and twenty minutes to an hour and a half later, at about 10:30 p.m. (RT 126; Pet. Exh. C – 1995 Police Report, p. 8.)[1] Marvin also testified that when petitioner returned, Marvin thought petitioner was "acting suspicious" and that he might have been out with a woman. (RT 131.) In 1995, it took about 25 minutes to drive from the club in Norwalk to Halgren's house in North Hollywood. (RT 223.)

Halgren's time of death was estimated at 10:00 p.m. to 11:00 p.m. on September 15, 1972. (RT 56.) Ramona discovered her mother's body at 2:00 p.m. the next day. (Pet. Exh. B – 1972 Police Report, p. 10.) Ramona called

---

[1] In 1972, Marvin told the police that petitioner had been with him almost the entire time they were at the club. (Pet. Exh. B – 1972 Police Report, p. 17.) Marvin attributed the difference in his stories to the fact that his mind was not clear on the night of the murder. (RT 123-24.)

the police and her husband, then ran hysterically into the street, where she drew the attention of 20 to 30 bystanders, all of whom subsequently entered the house and saw the body. (Id. at 11.) Police never established the identities of these spectators. (Id.)

Halgren's body was found face-down in a hallway, her hands tied behind her back with a piece of plastic clothesline from her backyard. (RT 177-79; Pet. Exh. B – 1972 Police Report, p. 3.)   The clothesline had also been used to strangle Halgren. (RT 51-52, 177-79; Pet. Exh. B – 1972 Police Report, p. 3.) Abrasions on Halgren's face indicated that she had been dragged around the house; a small piece of optical glass was recovered from her hair. (RT 51-52, 168.)  The optical glass was from a lens of rimless eyeglasses for a nearsighted person, probably in his or her early 40's, who did not depend extensively on the glasses and who would have used them primarily for reading print or watching television. (RT 181;  Pet. Exh. B – 1972 Police Report, p. 20.)

Two fingerprints, later determined to be petitioner's, were found on a cabinet door near the body. (RT 152-53; Pet. Exh. B – 1972 Police Report, p. 20.) The fingerprints could not be age-dated. (RT 156.)  Although the location of the prints was suspicious, the fingerprints did not constitute sufficient evidence to obtain a criminal complaint. (Pet. Exh. B – 1972 Police Report, p. 26.)

A living room window, which extended practically from floor to ceiling, had been broken from the inside out. (Pet. Exh. B – 1972 Police Report, p. 1.) Halgren was not robbed, and was found wearing a necklace worth $4,000. (Id. at 3.) She was wearing "capri" pants that had a matching blouse; however, she was not wearing the blouse when she was found. (Id. at 4.)  A thorough search of the house by police investigators did not turn up the blouse. (Id.) Halgren's glasses were discovered unbroken on the floor of her bedroom. (Id. at 5.)  A gun was found in her night stand. (Id.)  A clock radio, found on the floor, had

-8-

1   stopped at 12:14 a.m.  (Id. at 4.)

2       Interviews with Halgren's friends, relatives, and neighbors disclosed that

3   she was extremely security-conscious and would not open her door to anyone

4   she did not know.  (Id. at 9.)  This suggested to officers that Halgren knew her

5   assailant.  (Id.)

6       On the night of September 15, 1972, Halgren had visited a friend in the

7   hospital and left at approximately 8:30 to 9:00 p.m.  (2 Evid. RT 7; Pet. Exh. B

8   – 1972 Police Report, p. 10.)  She told her friend that she had a business

9   appointment later that evening.  (Pet. Exh. B – 1972 Police Report, p. 10.)  At

10  approximately 9:50 p.m., Ramona called Halgren.  (Id.)  Police checked phone

11  company records, but found that there was no way to confirm the telephone

12  call.  (Id.)

13      Ramona told police that as she was talking to her mother on the

14  telephone, someone came to her mother's door.  (Id. at 10, 17.)  Halgren told

15  Ramona that the person at the door was stockbroker Ansgar Martinius

16  Christensen, and that Halgren had let him in.  (Id. at 10; 2 Evid. RT 13-14.)

17  Ramona told her mother to ask him to leave.  (Id.)

18      Police interviewed Christensen, who stated that the last time he had

19  contacted Halgren was about three nights before the murder when he

20  telephoned her to give her the price of a stock.  (Id. at 13.)  Christensen said he

21  had not been in her house for over a week.  (Id.)  He then recalled that he had

22  talked to Halgren on Friday morning the 15th and possibly again on Friday

23  night.  (Id.)

24      On the evening of Friday, September 15, 1972, Christensen had been

25  taken to dinner by a potential client.  (Id.)  After dinner, Christensen returned

26  to his home in Glendale at about 10:15 p.m.  (Id.)  Christensen's neighbor said

27  he saw Christensen come home that night at approximately 10:15 or 10:20

28  p.m.  (Id. at 23.)  Christensen took a polygraph test administered by police; the

1   results were inconclusive. (<u>Id.</u> at 13.)

2           In 1955, Christensen was arrested for allegedly trying to defraud elderly

3   women of their money through bogus stock transactions. (<u>Id.</u> at 14.) He was

4   acquitted on all counts. (<u>Id.</u>)  Police were unable to ascertain the extent of

5   Halgren's stock holdings and transactions with Christensen. (<u>Id.</u>)  A sweater

6   belonging to Christensen was found hanging in Halgren's closet. (<u>Id.</u>)

7           Police received a tip from an unknown informant that petitioner had at

8   one time attempted to rape Halgren and threatened to kill her after his

9   advances were repulsed. (<u>Id.</u> at 15.)  Halgren's neighbor had heard from

10  Halgren that petitioner had tried to rape her, but did not believe the claim. (<u>Id.</u>

11  at 22.)

12          Petitioner took a polygraph examination on September 28, 1972. (<u>Id.</u> at

13  15.)  The polygraph examiner concluded that petitioner was untruthful on all

14  aspects of the murder and that petitioner was the murderer. (<u>Id.</u>)  Petitioner's

15  brother Marvin also was given a polygraph test and in the examiner's opinion,

16  Marvin was untruthful in his responses regarding the night of the murder. (<u>Id.</u>

17  at 17.)  Ramona's polygraph test results were inconclusive. (<u>Id.</u> at 18.)

18          Halgren's will bequeathed her entire estate to Ramona.  The funds were

19  to be disbursed in stages, with provisions being made for the three Gallion

20  children. (<u>Id.</u>)  Petitioner and Ramona divorced in 1973, the year after

21  Halgren's death. (RT 104.)

22  **B.      The Resumed Investigation.**

23          Testimony at the 1995 trial revealed the following:  In November 1992,

24  20 years after Halgren's death and after Ramona's death, Robin Wood,

25  Ramona and petitioner's youngest daughter, contacted the police department

26  about the investigation of her grandmother's death. (RT 212; Pet. Exh. C –

27  1995 Police Report, p. 6.)  Both of the original investigators on the case had

28  died. (RT 213; Pet. Exh. C – 1995 Police Report, p. 11.)  Detective Oscar

1   Carballo resumed the investigation and ultimately arrested petitioner. (Pet.
2   Exh. C – 1995 Police Report, p. 1.)
3        Detective Carballo interviewed Catherine Marie, who told Carballo that
4   shortly after the murder, petitioner had confessed to her that he had killed her
5   grandmother during a struggle, and that her grandmother had smashed his
6   eyeglasses. (RT 217-18.) Catherine stated that petitioner told her that
7   Halgren had fought hard and broken his glasses, just as Catherine had done
8   when petitioner abused her. (RT 218; Pet. Exh. C – 1995 Police Report, p. 9.)
9   Catherine related that petitioner told her that Halgren had fought to get to her
10  gun which was under the mattress in the bedroom. (RT 218; Pet. Exh. C –
11  1995 Police Report, p. 9.) Catherine also recalled that she and petitioner had a
12  second conversation in which he said that if he was ever convicted he would get
13  the chair. (Pet. Exh. C – 1995 Police Report, p. 10.)
14       Catherine told Carballo that a couple of years before the murder,
15  Halgren had told Catherine that she previously had an affair with petitioner.
16  (Id. at 10.) Catherine also said that Halgren had shown her a letter which
17  reflected that if Halgren were found dead, petitioner was the person
18  responsible. (Id.)
19       Finally, Catherine reported to Carballo that petitioner had sexually
20  molested Catherine and her sister Linda for several years. (Id. at 9.) Catherine
21  claimed that she had attempted to talk to the police during the intervening
22  years but was told that the murder happened a long time ago and the case file
23  could not be found. (RT 74; Pet. Exh. C – 1995 Police Report, p. 10.)
24  Catherine asserted that petitioner told her he would kill her if she came
25  forward and that is why she did not come forward sooner. (See RT 82; Pet.
26  Exh. C – 1995 Police Report, p. 10.)
27       Carballo also interviewed Robin Wood, who told him that she was 18
28  years old at the time of the murder. (Pet. Exh. C – 1995 Police Report, p. 6.)

Robin stated that she and the rest of the family always believed that petitioner was the murderer because petitioner had physically and mentally abused Robin until she was 16 years old. (Id.) Robin told Carballo that after Halgren's death, they found a letter from petitioner in Halgren's safe deposit box which indicated Halgren and petitioner were having an affair. (Id. at 7.) The letter contained threats to Halgren's life. (Id.) Robin did not know the whereabouts of this letter. (Id.)

Linda Chant, petitioner's eldest daughter, told Carballo that petitioner had molested her from the time she was 9 until she was 16 or 17 years old. (Id. at 8.)

Fay Cunningham, petitioner's second wife, told Carballo that she and petitioner had started dating around March 1973 and married the following year. (Id. at 7.) Cunningham recounted that her marriage to petitioner was turbulent, and that petitioner hit and otherwise assaulted her. (Id.) Cunningham eventually had petitioner served with legal papers to keep him away from her after their divorce. (Id.) Cunningham said petitioner never mentioned anything about Halgren's death. (Id.) Petitioner was convicted of assaulting Cunningham with a firearm, but petitioner denied that a gun was involved. (Pet. Exh. M – Pretrial Report, p. 1.)

C.    The 1995 Trial and Conviction.

On June 16, 1995, about six weeks before trial, petitioner requested that his public defender, Phillip Boche, be removed and that another attorney be appointed. (Pet. Exh. E – Marsden motion transcripts, pp. 2-6.) The Court denied petitioner's request. (Id. at 5.) On August 1, 1995, three days before trial, petitioner again requested that attorney Boche be removed. (Id. at 9.) Petitioner stated that Boche never discussed the case with him. (Id. at 12.) At the same hearing, petitioner refused a second-degree murder plea which he said Boche had not previously informed him was being offered. (Id. at 10.) The

- 12 -

1   Court again denied petitioner's request for a new attorney.  (Id. at 13-14.)

2           In pre-trial proceedings, Boche objected to the admission of any evidence

3   that petitioner had abused his daughters as unduly prejudicial.  (RT 37.)  The

4   prosecution argued that it needed the evidence of abuse to show why Catherine

5   did not come forward with petitioner's confession earlier.  (RT 38.)  The trial

6   court ruled that Catherine would be allowed to testify about her father's abuse,

7   and said it would give a limiting instruction that the jury was to consider the

8   evidence only for the purpose of explaining why Catherine waited 23 years to

9   come forward.  (RT 39.)  The court gave the limiting instruction during trial.

10  (RT 65.)  At the pre-trial hearing, the court deferred ruling on Boche's

11  objection to Robin and Linda's testimony.  (RT 39.)

12          At trial, Catherine testified as follows: a few days after Halgren's murder,

13  petitioner, Ramona, their daughters, and Catherine's boyfriend went to

14  Halgren's house to retrieve some of Halgren's belongings.  (RT 70.)  While

15  Catherine, her boyfriend, and others were in the living room, petitioner told

16  them how Halgren had been murdered, explaining that the police had given

17  him the details.[2]  (RT 77-78.)  Petitioner then told Catherine to walk outside

18  with him; petitioner led her to a small garden, where he confided that he had

19  killed her grandmother.  (RT 78.)  Catherine testified that petitioner told her

20  that "Halgren fought him just like [Catherine] fought him" and that "[s]he

21  broke his glasses just like [Catherine] did."  (RT 77-78.)

22          Catherine testified that petitioner said that Halgren fought all through

23  the house, that Halgren's head had gone through the living room window, and

24

25      [2] The original investigation report did not indicate that the details of Halgren's
    murder had been revealed to anyone.  However, the 1995 Police Report noted: "in the
26  early stages of this investigation [petitioner] was not considered a suspect but only a
    member of the family and as such had a considerable amount of information regarding
27  the murder and the evidence found at the crime scene, due to the fact that . . . his wife,
    Ramona, . . . found the deceased's body."  (Pet. Exh. B – 1972 Police Report, p. 15.)
28

1   that she screamed for the neighbors.  (Id.)  Further, according to Catherine,

2   petitioner said that Halgren tried to reach her gun in the bedroom and they

3   had fought for a long time.  (Id.)  Catherine testified that petitioner told her

4   that he killed Halgren by choking her with his hands and that he pulled up her

5   shirt and tied her hands with rope or clothesline and that he had done

6   something with her bra.  (RT 78-79.)

7          Catherine testified that petitioner said he had wiped everything down to

8   remove his fingerprints, but that he was worried because he had forgotten to

9   retrieve his cigarettes and to wipe his prints off an area near where Halgren

10  fell.[3]  (RT 79.)  Petitioner told Catherine he had killed Halgren because she did

11  not deserve her wealth and because Halgren was not going to give him any

12  more money.  (RT 79-80.)

13         The police did not interview Catherine in 1972 and, in twenty years, she

14  did not tell anyone (including her sisters) that her father had confessed to her.

15  (RT 79, 93.)  Catherine was twenty years old at the time of the alleged

16  confession.  (RT 76.)  Catherine testified that shortly after her grandmother's

17  death, petitioner bought her a car for being a good girl and not telling anyone

18  about his confession.  (RT 80.)

19         Catherine testified that she did not come forward sooner because she was

20  afraid of petitioner, who had abused her.  (RT 81.)  For example, she testified

21  that one time petitioner put a luger gun in her bottom and pulled the trigger,

22  then put it in her mouth and pulled the trigger, and then pointed the gun into

23  the air and fired it.  (RT 66.)  She also testified that when she was about twelve

24  years old, petitioner held poker parties and passed her around to the other men

25  in exchange for money.  (Id.)  Catherine recalled that petitioner made the

26

27         [3] No cigarettes were found at the scene, but many fingerprints were found.  (Pet.

28  Exh. B – 1972 Police Report, pp. 20-21.)

1   children play Russian roulette, beat them, and made them strip and fight each

2   other.  (RT 81.)  Catherine testified that petitioner told the girls he would kill

3   them and that she believed he had killed her grandmother.  (Id.)  Catherine

4   said she moved to Canada and later Switzerland to keep her father from

5   finding her, and that she changed her last name for the same reason.  (RT 82.)

6       Catherine testified further that petitioner told her that he confessed only

7   to her because she told the truth and had the guts to stand up to him.  (RT 80-

8   81.)

9       Attorney Boche questioned Catherine about the specifics of petitioner's

10  confession.  (See RT 88-91.)  He asked Catherine to describe the glasses

11  petitioner wore on the day her grandmother was killed and the kind of glasses

12  he wore thereafter.  (RT 95.)  In response to Boche's questions about the

13  manner in which Catherine broke petitioner's glasses, she replied that she bent

14  the frames until the lenses popped out but that no part of the glasses actually

15  broke.  (RT 95-96.)

16      Robin, Catherine's younger sister, testified that there was "lots of abuse"

17  going on in their family.  (RT 99.)  She said she was physically and mentally,

18  but not sexually, abused by her father.  (RT 100.)  For example, on one

19  occasion, petitioner stuck a pin in a bug and forced Robin to watch it until it

20  died.  (Id.)

21      Robin stated that her family's lifestyle changed after her grandmother's

22  death when her mother inherited the bulk of the estate, and the family's

23  standard of living improved.  (RT 104.)  Robin testified that the only kind of

24  eyeglasses she saw her father wear, from the late 1960's until the murder, had

25  plastic lenses and brown frames which did not go around the bottom of the

26  glasses.  (RT 105-06.)  She further testified that petitioner purchased new

27  glasses about a month after her grandmother was killed.  (RT 107.)

28      On cross-examination, Boche elicited that petitioner's new glasses had

- 15 -

1   plastic frames which did not reach the bottom of the glasses. (RT 111.) When

2   asked about Catherine's reputation for honesty and truthfulness, Robin opined

3   that Catherine did not have a poor reputation. (RT 116.)

4       Petitioner's brother Marvin testified that he had been interviewed by the

5   police in 1972, and, at that time, told the police petitioner was with him at the

6   club except for a short period. (RT 122.) When interviewed by Detective

7   Carballo in 1995, Marvin changed his story and said that petitioner had been

8   gone for about an hour and a half. (RT 123, 125-26.) Marvin testified that on

9   the night of the murder he had a broken leg, was going through a divorce, and

10  had been drinking heavily; he stated that his mind was not clear then but,

11  twenty years later, he was able to remember more clearly what happened. (RT

12  123-24.)

13      Marvin testified that petitioner acted suspiciously when he returned to

14  the club that night, which behavior made Marvin suspect that petitioner had

15  been out with a woman. (RT 130.) Marvin testified that petitioner wore the

16  same glasses when he returned to the club that he had worn when he left. (Id.)

17  Marvin denied having any fall-outs with petitioner in the twenty years since

18  1972. (RT 124.) Marvin testified that he had never spoken with petitioner's

19  second wife about the night of the murder. (RT 128.)

20      Halgren's autopsy indicated that the time of death was probably between

21  10:00 and 11:00 p.m. on September 15, 1972. (RT 56.) However, Halgren

22  could have died at any time between approximately 8:00 p.m. on September 15

23  and 8:00 p.m. on September 16, 1972. (RT 55.)

24      A small piece of glass was found in Halgren's hair. (RT 168.) An

25  optometrist testified that it was a piece of an eyeglass lens and that it

26  contained two separate powers – a slight correction for farsightedness and a

27  slight correction for astigmatism. (RT 186, 188.) A police criminalist testified

28  that the piece of glass was consistent with a piece of a rimless eyeglass lens for a

1  nearsighted person. (RT 181.)

2  Only the police were informed about the glass found in Halgren's hair, in

3  accordance with coroner's office policy.[4] (RT 168-70.) Detective Carballo

4  testified that in his experience, not much information about a case is released

5  to anyone because it is never clear when a certain piece of evidence or

6  information will become crucial in the investigation. (RT 214.)

7  Detective Carballo also testified that the drive from the club to Halgren's

8  house and back at the approximate hour of the murder, using two different

9  routes, took from 20 to 30 minutes each way and that, in his opinion, the drive

10  would have taken less time in 1972, when traffic was much lighter. (RT 219-

11  24.)

12  Against the advice of counsel, petitioner testified in his own defense.

13  (RT 230.) The only other defense witness was petitioner's brother Marvin.

14  (RT 233.) Marvin repeated his earlier testimony – petitioner left the bar for

15  about an hour and a half that night. (RT 234-35.) In fact, Marvin added that

16  he told Detective Carballo in 1994 that he thought petitioner tried to use him

17  as an alibi. (RT 236.)

18  Petitioner testified as follows: he did not kill Halgren and he did not tell

19  Catherine that he did. (RT 238-40.) He took Marvin to the club because

20  Marvin wanted to go and because Marvin had been cooped up at home with a

21  broken leg. (RT 240.) The two arrived at the club at 8:40 p.m.; at 9:00 p.m.,

22  petitioner left to call his wife; he called her later as well. (Id.) During the

23  band's performance, petitioner went outside numerous times because the band

24  was very loud, but never left for more than ten minutes. (RT 240-41.)

25  Petitioner and Marvin left the bar at 11:00 p.m. and went to a bowling alley

26  

27  [4] The 1972 police report states, "The fact that this glass has been found by the [i]nvestigators has been kept a very guarded secret." (Pet. Exh. B – 1972 Police Report,

28  p. 20.)

1    where they stayed until 12:30 a.m. (RT 241.)

2        Petitioner indicated that his fingerprints were on Halgren's cabinet door

3    because he had been in Halgren's house many times; in fact, he had previously

4    lived there for three years. (RT 242.)  More specifically, about a week before

5    Halgren died, he and Ramona were at Halgren's property to replace a fern; on

6    that occasion, petitioner retrieved a towel from the cabinet where his print was

7    later found by police. (Id.)

8        Petitioner denied that the glass found in Halgren's hair was from his

9    glasses; he noted Marvin's testimony that petitioner had worn the same glasses

10    when he returned to the bar. (RT 242-43.)  Petitioner denied purchasing new

11    glasses after the murder. (RT 243.)

12        Petitioner denied buying a car for Catherine to reward her for not

13    disclosing his confession. (RT 245.)  He said that each of the girls received a

14    new car from Ramona and him as parental gifts, and that Ramona signed the

15    checks. (RT 246.)  In response to attorney Boche's question, petitioner denied

16    ever physically, sexually, or emotionally abusing his daughters. (Id.)

17        Under prosecution questioning, petitioner testified that he could not

18    imagine ever using force to strangle his mother-in-law, or using force against

19    any woman, or any person. (RT 250.)  Petitioner admitted that he had a prior

20    conviction for simple assault, but the prosecution introduced evidence

21    purportedly verifying that petitioner's conviction was for assault with a gun.

22    (RT 270.)  Boche conducted no redirect examination and rested petitioner's

23    case. (See RT 272.)

24        The prosecution called two rebuttal witnesses, the first of whom was

25    Daniel Welsh, petitioner's probation officer, who testified that petitioner had

26    previously informed Welsh that petitioner had been convicted of an assault

27    with a gun, although petitioner denied using a gun. (RT 274.)  Under Boche's

28    cross-examination, Welsh admitted that he had no legal document showing the

1   offense for which petitioner was convicted, but had relied only on descriptions

2   provided by petitioner or petitioner's daughter.  (RT 275.)

3        The prosecution's final rebuttal witness, petitioner's eldest daughter

4   Linda, testified that petitioner molested her while holding a gun, that he

5   threatened to kill her and the rest of her family, and that he physically abused

6   their mother.  (RT 279-80, 284-85.)

7

8                                    V.

9                INEFFECTIVE ASSISTANCE OF COUNSEL

10       Petitioner alleges that attorney Boche was ineffective in his

11  representation of petitioner in numerous instances.  Petitioner has framed his

12  contention as two separate claims, but the Court has analyzed counsel's

13  deficiencies in a slightly different manner in order to ensure application of the

14  appropriate standard of review.  As explained below, this Court has determined

15  after independently reviewing the record that several of counsel's failures were

16  so starkly detrimental to petitioner's case that the state courts' decisions to the

17  contrary are objectively unreasonable under AEDPA standards.  28 U.S.C.

18  § 2254(d).

19       To establish a prima facie claim of ineffective assistance of counsel,

20  petitioner must demonstrate that trial counsel's performance was deficient and

21  that the deficient performance prejudiced the defense.  Strickland v.

22  Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

23  Petitioner bears the burden of establishing both components.  Id.  Deficient

24  performance is conduct which is objectively unreasonable under prevailing

25  professional norms.  Id. at 687-88.  Under Strickland, counsel's deficient

26  performance prejudices a petitioner where there is a "reasonable probability

27  that, but for counsel's unprofessional errors, the result of the proceeding would

28  have been different."  Id. at 694.

                                   - 19 -

1    In reviewing trial counsel's performance, the Court presumes that

2    counsel's conduct was within the wide range of reasonable assistance, and that

3    attorney Boche exercised acceptable professional judgment in all significant

4    decisions made. Id. at 689. Only if counsel's acts or omissions, examined

5    within the context of all the surrounding circumstances, were outside the

6    "wide-range of professionally competent assistance," can petitioner meet this

7    initial burden. Id. at 690.

8    **A.     Discrediting Catherine**

9        There is no question that Catherine's testimony was pivotal to the

10   State's case. Other evidence at trial paled in comparison to the full confession

11   about which Catherine testified. In the twenty years between 1972 and 1992

12   (when Catherine came forward with her story), no charges were filed against

13   petitioner. (See Pet. Exh. B – 1972 Police Report, p. 26.) Any reasonable

14   defense strategy, therefore, would necessarily have included impeachment of

15   Catherine's credibility, if such was possible. In fact, as shown below, lawyer

16   Boche possessed ample evidence with which he could have severely

17   undermined Catherine's credibility; yet he presented none of it to the jury.

18       In the evidentiary hearing before this Court, Boche admitted that he

19   possessed and read, prior to trial, Catherine's medical records from two

20   hospitalizations which established, among other things, that she had been

21   diagnosed as a schizophrenic who "lived in a fantasy world." (1 Evid. RT 80,

22   102.) Boche testified that he chose not to use any portion of these records

23   because they would have bolstered Catherine's claims of abuse.[5] (Id. at 116.)

24

---

25       [5] In correspondence between Boche and petitioner's appellate counsel, Boche

26   explained his thinking as follows: "I thought the medical records would be more harmful
     than helpful to Mr. Gallion's defense. I don't recall my reasons for not introducing

27   Catherine's inconsistent statements or her abuse by other persons." (Pet. Exh. J –

28   8/19/96 Boche letter to Gray.) At the evidentiary hearing, Boche testified that he did

Catherine's medical records (in Boche's possession) included the following: In 1969, Catherine was admitted to UCLA Neuropsychiatric Hospital for twice attempting suicide and increasing depression. (Pet. Exh. G – 1969 Med. Records, pp. 2-3.) While there, she stated that she was not molested by petitioner because she "warded off" his advances, but that she had witnessed petitioner molesting her sister which "filled [her] with a mixture of disgust and envy." (Id. at 2.) One of the staff summarized Catherine's state of mind at the time as follows:

> The patient admits to having some hallucinations just in the last
> day or two prior to admission, consisting of people that she knows.
> She will not elaborate on the content of the hallucinations. She
> has a very active fantasy world and over the past year or so has
> spent much time communicating with these imaginary characters
> who she says, are like the characters in the real world but more
> understanding. She is able to distinguish fairly sharply between
> real people and these fantasy people.

(Id. at 6.)

On a questionnaire completed during her hospitalization, Catherine responded "'true'" to the statements, "'Someone has been trying to influence my mind'" and "'I hear strange things when I'm alone.'" (See 1 Evid. RT 109; Pet. Exh. G – 1969 Med. Records, p. 18.)

Catherine was diagnosed during this 1969 hospitalization as a "borderline psychotic" or as appearing to have "schizoid personality" or alternatively as "schizo-affective, depressed" or "chronic schizophrenic." (Pet. Exh. G – 1969 Med. Records, pp. 6, 16.)

---

not use the medical records to impeach Catherine because he did not want to call more attention to the issue of molestation. (2 Evid. RT 50-51, 54; see also Pet. Exh. I – Boche Decl., p. 5, ¶ 12.)

In 1988, Catherine voluntarily admitted herself to CPC Vista Del Mar Hospital because of "fear, depression for years especially aggravated for two months with suicidal ideation and anxiety-like attacks." (Pet. Exh. H – 1988 Med. Records, p. 1.) During this admission, Catherine attributed past sexual abuse to her mother and sister, not her father. As one report noted: "The patient believes she has been depressed since early childhood when she was 'sexually molested' by, in her own words, [her] mother and a sister." (Id. at 1.) In another part of her 1988 medical records, Catherine accused her mother of being a homosexual. (Id. at 13.) The report also states that the sexual molestation occurred "over a long period of time by her sister and her mother." (Id. at 13.)

A medical report generated one month later stated that Catherine "has a long history of being sexually and physically molested by mother's husband."[6] (Id. at 9.) Another report stated that the "father is defined as a molester, arrogant and child-beating" and that the "father molested Catherine's sister while Catherine shared a bed with [her]." (Id. at 13.)

Although these reports contain statements by Catherine indicating that petitioner molested her, they also contain accusations that her mother and sister molested her as well, claims no one has suggested were true. Most importantly, however, these records show that Catherine was suffering from mental health problems so severe that they caused her to hallucinate and live in a "fantasy world." Whether these reports corroborated Catherine's testimony about abuse by petitioner was relatively unimportant compared to the potential they contained for discrediting Catherine's testimony of petitioner's

---

[6] The record is not clear whether this reference was to petitioner. While the term "mother's husband" connotes a non-biological relationship, all evidence before this Court indicates petitioner is Catherine's biological father.

confession.[7]

Crucial to counsel's decision whether to further investigate these medical reports or to seek to introduce them at trial should have been a realization that Catherine's credibility in relaying petitioner's confession was pivotal to the prosecution's case – any evidence that she was not credible would have been extremely helpful to the defense.  Indeed, attorney Boche should have recognized that without these records, Catherine's testimony about petitioner's confession would go essentially untested.  Cf. Rios v. Rocha, 299 F.3d 796, 805-06, 808 (9th Cir. 2002) (defense counsel's failure to interview more than one eyewitness out of fifteen was ineffective assistance, especially where State's case was weak and testimony of State's five eyewitnesses was inconsistent and severely impeached).

Moreover, Boche did not test Catherine's credibility or recollections in other manners, either.  For example, Boche did not investigate what Catherine's sister, Linda, might know about the many stories Catherine told.  As was made clear at the evidentiary hearing, had the attorney interviewed Linda prior to trial, he would have discovered that she could have refuted nearly all of Catherine's stories of abuse.  Counsel failed to investigate Catherine's testimony or history, which was unreasonable given the medical records in his possession prior to trial.

Boche testified at the evidentiary hearing that "a rough guess" of the total amount of time he spent before trial on Petitioner's first-degree murder case was about 30 hours.  (1 Evid. RT 134.)  When questioned as to whether

---

[7]   It is noteworthy that Catherine's sisters testified about the abuse as well and petitioner offered only an unpersuasive general denial to the allegations; therefore, whether the reports bolstered Catherine's reporting of abuse was even less important – the testimony was already "bolstered."  Counsel Boche admitted as much at the evidentiary hearing.  (1 Evid. RT 122.)

- 23 -

30 hours afforded him adequate time to prepare a defense, Boche hesitated for a lengthy period and then stated that he may have spent as much as 60 or 90 hours. (Id. at 134-40.)  After more hesitation, Boche testified that "thirty hours was the estimate that [he] believed most accurately described, to the best of [his] recollection, the amount of time [he] spent in preparation of the case."[8] (Id.)  In response to questions about why he spent so few hours preparing for this first degree murder trial, Boche answered, "I did what I thought I should do." (2 Evid. RT 22.)  He testified that his "strategy was to investigate to the extent that I could, to corroborate [petitioner's] alibi as well as I could, and to hopefully minimize the damage of the prosecutor's testimony and hopefully find that the prosecutor's case would fail for insufficient proof." (1 Evid. RT 134.)

When asked why he did not cross-examine Catherine about the inconsistent statements in her medical records, Boche stated that he thought that introduction of the medical records was "outweighed by other considerations" in that the records "corroborat[ed] . . . the sexual molestation by Mr. Gallion of his daughter that's contained in the medical record," which in turn, shows Catherine did not make this up in 1995. (1 Evid. RT 116.)

Thus, according to trial counsel, the key issue was molestation, not his client's guilt or innocence of murder.  Attorney Boche apparently decided it was more important to prevent any additional evidence from being introduced that petitioner had molested Catherine than it was to present evidence that might well have established reasonable doubt as to Catherine's veracity about the murder confession.  The incongruity and indefensibility of this decision lies at the heart of counsel's ineffectiveness.

---

[8]   On the second day of the evidentiary hearing, Boche changed his official estimate to a range of 30 to 60 hours.  (2 Evid. RT 22.)

1        The State argues that the failure to impeach Catherine, or any other

2   witness, was a matter of strategy – a reasonable judgment that Boche made

3   about the value of placing this evidence before the jury – that should not be

4   second-guessed.   (See Answer, p. 13.)  But, as the Ninth Circuit Court of

5   Appeals observed in United States v. Tucker, 716 F.2d 576, 586 (9th Cir.

6   1983), "[i]t is difficult for this Court to attribute such a critical blunder to a

7   strategic choice."  Id.

8        Petitioner was on trial for murdering his mother-in-law, not for molesting

9   his daughters.  While counsel's decision not to cross-examine Catherine about

10  her psychiatric history may have been a strategy or trial tactic, it was

11  nevertheless such a poor decision within the context of this case that it falls far

12  outside the bounds of reasonable representation.  See Tucker, 716 F.2d at 581,

13  583-586 (counsel's inadequate preparation and investigation, leading to his

14  inability to conduct effective cross-examination of government witnesses,

15  constituted ineffective assistance of counsel); Smith v. Wainwright, 799 F.2d

16  1442, 1443-44 (11th Cir. 1986) (ineffective assistance of counsel found where

17  counsel failed to impeach accomplice through cross-examination when

18  accomplice's credibility was central issue in case); see also Nixon v. Newsome,

19  888 F.2d 112, 115-16 (11th Cir. 1989) (attorney's failure to confront

20  prosecution witness with prior inconsistent statements made at co-defendant's

21  trial, or to introduce transcript of same, constituted ineffective assistance of

22  counsel; at stake was identity of person who shot victim).

23       The collateral prejudice Boche sought to avoid (that petitioner was a

24  sexual molester) was already before the jury.  (See RT 61-84.)  In fact, at the

25  evidentiary hearing, attorney Boche conceded that the evidence before the jury

26  of sexual molestation by petitioner was substantial.  (1 Evid. RT 122.)  Thus,

27  little, if any, tangible increase in this prejudice could have resulted from

28  introducing medical records which, while showing that Catherine was

- 25 -

1   delusional and fantasized, also allowed for the possibility she had been

2   molested by petitioner.  Defense counsel's decision to forego impeaching

3   Catherine when there was overwhelming evidence to show Catherine's

4   testimony was unreliable, and thereby create a reasonable doubt as to

5   petitioner's guilt, was objectively unreasonable.

6       Boche's additional reason for not attacking Catherine's credibility – that

7   he did not want to anger the jury by appearing to attack this sympathetic

8   witness – was neither reasonable nor defensible as a strategic decision.  To the

9   extent Catherine was sympathetic and the jury believed she had been sexually

10  abused by petitioner, defense counsel's failure to attack her credibility was

11  tantamount to conceding that petitioner was a murderer and that Catherine

12  was a truthful witness.  Nothing could have been more harmful to petitioner's

13  case.  Therefore, a decision to ignore these reports was not a reasoned tactical

14  choice under any scenario.

15      Even assuming Boche's failure to make use of the psychiatric records

16  during cross examination was a matter of strategy, "this omission is thereby not

17  immune from judicial scrutiny."  See Tucker, 716 F.2d at 586; see also  United

18  States v. Span, 75 F.3d 1383, 1389 (9th Cir. 1996) ("The label of 'trial

19  strategy' does not automatically immunize an attorney's performance from

20  Sixth Amendment challenges.").  "Certain defense strategies may be so

21  ill-chosen that they may render counsel's overall representation constitutionally

22  defective."  Tucker, 716 F.2d at 586.  As the Supreme Court has explained,

23  "[a]dequate cross-examination of witnesses is 'the principal means by which

24  the believability of a witness and the truth of his testimony are tested.'"  Davis

25  v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).  "The

26  jury can hardly be said to have had the opportunity to consider the truth and

27  credibility of the witnesses' testimony where . . . there was no significant cross

28  examination of any government witness."  Tucker, 716 F.2d at 593.  Therefore,

1   "an attorney's failure to prepare for and challenge the testimony of a critical

2   witness may be so unreasonable as to violate both prongs of the <u>Strickland</u>

3   test." <u>Silva v. Woodford</u>, 279 F.3d 825, 833 (9th Cir. 2002).

4        Relying on <u>Silva</u>, however, the state argues that a decision not to cross-

5   examine a sympathetic prosecution witness is an objectively reasonable trial

6   strategy. <u>See id.</u> at 852. While cross-examination generally is a question of

7   trial strategy, <u>see</u> <u>United States v. Rodriguez-Ramirez</u>, 777 F.2d 454, 458 (9th

8   Cir. 1985), the state's reliance on <u>Silva</u> is misplaced in this case.

9        In <u>Silva</u>, defense counsel decided not to impeach a co-defendant

10  testifying against the petitioner with evidence that the co-defendant had been

11  in a coma from a serious motorcycle accident, had a metal plate in his head,

12  and was highly receptive to suggestion. <u>Id.</u> The Ninth Circuit found defense

13  counsel did not act unreasonably because the prosecution had already

14  introduced this evidence and further questioning might have generated

15  sympathy for the co-defendant, defense counsel effectively cross-examined the

16  co-defendant on other issues, and there was overwhelming evidence of the

17  petitioner's guilt. <u>Id.</u> at 852-53. By contrast, in the case at bar, the jury heard

18  absolutely nothing about Catherine's serious psychological problems and her

19  inconsistent allegations as to who had abused her. Further, attorney Boche

20  failed to effectively cross-examine Catherine on any other ground, and the

21  remainder of the prosecution's case against Petitioner was very weak.

22       Defense counsel performed deficiently when he declined to investigate

23  further and present evidence of Catherine's troubled mental health which

24  would have cast significant doubt on her account of petitioner's confession.

25  This failure was so egregious that the state court's decision to the contrary was

26  either an objectively unreasonable application of <u>Strickland</u>, or an objectively

27  unreasonable determination of the facts in light of the record. 28 U.S.C.

28  § 2254(d).

1    Determining that counsel's performance was deficient does not end the

2    inquiry however.  Petitioner must also demonstrate that counsel's failure

3    prejudiced his defense, in other words, that there is a "reasonable probability

4    that, but for counsel's unprofessional errors, the result of the proceeding would

5    have been different."  Strickland, 466 U.S. at 694.  Petitioner meets this

6    burden as well.  As with the first portion of the Strickland analysis, petitioner's

7    showing is so strong that a state court decision to the contrary is objectively

8    unreasonable.  28 U.S.C. § 2254(d).

9    Although there was other evidence adduced against petitioner, there is no

10   doubt that Catherine's testimony recounting petitioner's full confession was by

11   far the most damaging, as respondent seems to concede in this Court.  (See

12   Supplemental Brief, p. 6.)  In fact, Catherine's account of petitioner's

13   confession was the one item of evidence that directly linked petitioner to the

14   murder.  The other evidence scarcely showed any connection:  two fingerprints

15   found in Halgren's house, where petitioner had been many times and which

16   could not be age-dated; a piece of optical glass tenuously linked to petitioner by

17   Catherine's testimony; and Marvin's testimony about the length of time

18   petitioner was absent from the club, which differed dramatically from the story

19   he told at the time of the murder.

20   The State, however, contends that impeaching Catherine with evidence

21   from her medical records would have had little impact on the trial as it was at

22   best a collateral matter, and her testimony regarding petitioner's physical,

23   emotional, and sexual abuse of his daughters was corroborated by Linda Chant

24   and Robin Wood's testimony.[9]  (Answer, p. 15.)  The Court finds ironic and

25

_____

26   [9] The latter statement has no support in the record.  While Robin may have
     testified that petitioner had physically and emotionally abused her, and while Linda
27   testified that petitioner had sexually molested her, neither daughter testified that
     petitioner had sexually molested Catherine.  In fact, Linda testified that she never saw
28

1  contradictory the State's contention that Catherine's abuse was a collateral

2  matter (Answer, p. 15), and its agreement that Catherine's credibility was a

3  material issue in the case. (Answer, p. 26.)  To claim before this Court that the

4  alleged abuse was a collateral matter when the State at trial boldly used this

5  evidence to explain Catherine's twenty-three year delay in coming forward with

6  her pivotal testimony is wholly disingenuous.

7          Catherine's credibility was the key issue in the case and any evidence

8  bearing on her credibility was material.  Therefore, this Court finds that

9  attorney Boche's failure to use Catherine's medical records to impeach her

10  credibility on the abuse issue was inexcusable and resulted in extreme prejudice

11  to petitioner's defense.  Accordingly, this Court does not hesitate to conclude

12  that there is a reasonable probability that absent Boche's professional

13  deficiencies, the outcome of the trial would have been different.[10]

14          Catherine was the State's key witness at trial.  It was not just important

15  for the defense to impeach her credibility, it was critical.  Yet, attorney Boche

16  failed to test her credibility in any significant manner despite the fact that he

17  possessed hospital records stating that she hallucinated and lived in a fantasy

18  world.   Further, given that the remainder of the evidence against petitioner

19  was not strong, the state courts' determination that there was not a reasonable

20  probability of a different outcome had the jury been told of Catherine's severe

21  mental problems was objectively unreasonable.  28 U.S.C.§ 2254(d);

22  Strickland, 466 U.S. at 695; cf. Hart v. Gomez, 174 F.3d 1067, 1073 (9th Cir.

23  1999) (counsel's failure to introduce evidence corroborating testimony of key

24

25  any evidence that petitioner had sexually molested Catherine. (See RT 27-28.)

26          [10]   Certainly this conclusion is bolstered by the fact that for the twenty years
    prior to Catherine's intervention there apparently was not sufficient evidence to trigger
27  the arrest and/or prosecution of petitioner.  (See Pet. Exh. B – 1972 Police Report, p.
28  26.)

1  defense witness was prejudicial).  Accordingly, the Court finds federal habeas

2  relief is warranted.

3  **B.     Failure to Test Prosecution Evidence**

4         Boche also could have tested the prosecution's case by challenging the

5  prosecution timeline for Halgren's murder.  Boche possessed evidence which

6  would have suggested that someone else, namely Ansgar Martinius Christensen,

7  was at Halgren's house at 10:00 on the night of the murder.  The prosecution's

8  theory was that petitioner left the club at 9:00 p.m., arrived at Halgren's house

9  around 9:30, killed her and cleaned up until around 10:00, and then returned

10  to the club by 10:30.  Boche could have undermined this timeline with

11  available evidence that Halgren was on the phone with Ramona around 10:00

12  and told Ramona that she had just let in Christensen.  (Pet. Exh. B – 1972

13  Police Report, pp. 10, 17.)

14         Not only would this information have cast doubt on the prosecution's

15  timeline, it may have created reasonable doubt about petitioner's guilt.  As

16  noted, Christensen was Halgren's stockbroker and Halgren told someone on

17  Friday night, the night of the murder, that she was going home for a business

18  meeting.  (2 Evid. RT 7; Pet. Exh. B – 1972 Police Report, p. 10.)

19  Christensen's sweater was found at Halgren's house (Id. at 14); a stock

20  certificate was found on her table (Id. at 2).  Importantly, Christensen

21  previously had been arrested for defrauding elderly women on stock

22  transactions. (Id. at 14.)  Boche's failure to investigate these facts further was

23  unreasonable.  See Strickland, 466 U.S. at 691 ("[C]ounsel

24  has a duty to make reasonable investigations or to make a reasonable decision

25  that makes particular investigations unnecessary.").

26         In this Court, lawyer Boche testified that he did not try to introduce

27  evidence of the phone call between Halgren and Ramona because he believed it

28  was irrelevant. (2 Evid. RT 14-17.)  When pressed further, Boche hesitatingly

- 30 -

1  admitted that evidence of Christensen's presence may have been relevant, but

2  then opined that the police report, which contained evidence of the phone call,

3  would have been inadmissible. (2 Evid. RT 11-19.) Boche admitted, however,

4  that he neither offered the police report into evidence nor requested a ruling on

5  its admissibility.[11] (2 Evid. RT 18.)

6      According to trial testimony, there was only a small window of time

7  during which petitioner could have murdered his mother-in-law. Therefore,

8  evidence that Halgren was alive (and with someone else who had at least a

9  conceivable motive to do her harm) during that window of time would have

10  been a key component in the establishment of reasonable doubt. Boche's

11  failure to pursue it, for the reasons he offered in this Court, was wholly

12  unreasonable. Strickland, 466 U.S. at 690. Given the critical nature of the

13  timeline in this case, the failure to challenge it with evidence contained in a

14  police report also was prejudicial. Id. at 695; Brown v. Myers, 137 F.3d 1154,

15  1157-58 (9th Cir. 1998) (petitioner prejudiced by attorney's failure to call alibi

16  witnesses).

17      Boche also failed to raise any doubt about the prosecution's timeline

18  with evidence that a clock radio, which was found on the floor, had stopped at

19  12:14 a.m. (1 Evid. RT 141; Pet. Exh. B – 1972 Police Report, p. 4.) The

20  1972 Police Report states: "It is very possible that this victim was struggling

21  with her assailant and in doing so knocked over the lamp, clock, telephone, and

22  nightstand, in her effort to reach this gun." (Pet. Exh. B – 1972 Police Report,

23

24      [11] Boche answered "no" to questions asking if he tried to have the police report

25  containing the conversation between Halgren and Ramona admitted under any of the
   following code sections or theories of admissibility: California Evidence Code sections

26  1240 (spontaneous statements), 1241 (contemporaneous statements), 1250 (then
   existing state of mind), 1280 (public employee report), the business records exception,

27  on grounds that the statement was not hearsay, or that it was the most reliable evidence

28  since all sources were deceased. (2 Evid. RT 15-16.)

1   p. 5.)  Boche agreed that if it was knocked over and stopped at 12:14 a.m. as a

2   result of the struggle with Halgren, it would be exculpatory evidence because

3   petitioner had an unquestionable alibi at that time.  (1 Evid. RT 145.)

4   Attorney Boche did not use this evidence at trial, however,  because he

5   apparently had adopted the "dead on arrival" viewpoint that the prosecution

6   could easily rebut it by arguing that petitioner had taken such pains to clean up

7   his fingerprints and such around the area, that he would have wiped his

8   fingerprints off the clock and reset it to a time for which he had an alibi.

9   Boche also said that a paper towel matching those in the kitchen was found

10  next to the clock, suggesting that the murderer had wiped off the clock as well.

11  (1 Evid. RT 141; Pet. Exh. I – Boche decl., p. 3, ¶ 6.)

12        But the mere fact that the prosecution was prepared to cast doubt upon

13  exculpatory evidence is not a reasonable basis for failing to introduce it.  See

14  Rios v. Rocha, 299 F.3d 796, 805-06 (9th Cir. 2002) (trial counsel provided

15  ineffective assistance in deciding not to pursue a mistaken identity defense

16  after speaking with only one of fifteen eyewitnesses, and concluding that

17  "'somebody was going to be able to put the gun in [defendant's] hand

18  evidently.'").   A criminal defense attorney's principal task is to put a

19  reasonable doubt in the minds of the jurors as to his client's guilt.  Introduction

20  of the clock would have created, or at least added to, that doubt, and Counsel's

21  reason for not introducing the clock is simply unreasonable.  Failure to

22  introduce the clock was prejudicial because it rendered the result of the trial

23  unreliable; had the evidence of the clock been introduced, there may have been

24  a different result.

25        Counsel Boche also let pass an opportunity to impeach the adverse

26  testimony of Marvin Gallion, petitioner's brother, that petitioner was gone

27  from the club for an hour and a half on the night of the murder.  (See 1 Evid.

28  RT 95.)  This was contrary to his earlier statement to the police at the time of

1   the murder in 1972 that petitioner was with him at the club the entire evening.

2   (Pet. Exh. B – 1972 Police Report, p. 17.)  The prosecution asked Marvin if he

3   and petitioner ever had a falling out since the time of the murder, and Marvin

4   answered that he has had no bad words with petitioner. (RT 124.)

5        According to petitioner, the brothers are no longer on good terms.  When

6   their mother died in 1992, the family learned that petitioner's name was on the

7   deed to inherit her house.  Up to this time, they believed the house would be

8   sold and the money divided between all of them.  (1 Evid. RT 71.)  The bad

9   feelings over the disposition of the house were so great that the family locked

10  petitioner out of the residence while he was out of state, until police told them

11  they could not keep him out, but to the contrary, as owner, he could keep them

12  out.  (1 Evid. RT 74.)  The brothers have not spoken since then.  (1 Evid. RT

13  73.)  Petitioner testified at the evidentiary hearing that he tried to tell Boche

14  about this falling out, but Boche would not listen; Boche was more interested

15  in persuading him to sign a plea agreement.  (1 Evid. RT 75-76.)  Either

16  counsel  Boche ignored this information, or if petitioner did not tell Boche,

17  Boche still did nothing to investigate why Marvin had dramatically changed his

18  story about petitioner's whereabouts on the night of the murder.  Either way,

19  Boche's failure to pursue the cause or causes of this turnabout by Marvin was

20  objectively unreasonable, especially since petitioner had information, at least

21  partially subject to independent corroboration, which explained why Marvin

22  had changed his story.  Boche could have used evidence of the estranged

23  relationship between petitioner and his brother to impeach Marvin's trial

24  testimony, which was the other late-arriving element of the state's case against

25  petitioner.

26       As with Catherine's testimony of abuse, this court concludes that

27  creating doubts about the window of time petitioner had to commit the murder

28  probably would have resulted in a different trial outcome.  Accordingly, the

- 33 -

1   Court finds Boche's unprofessional conduct prejudicial.  The state courts'

2   determination to the contrary was objectively unreasonable.  28 U.S.C.

3   § 2254(d).

4   **C.    Counsel's Reasonable Actions.**

5          Petitioner claims that Boche was ineffective when he did not object

6   during petitioner's testimony to questions seeking inadmissible character

7   evidence and evidence of prior bad acts in violation of California evidentiary

8   law.  (Statement, pp. 41-50.)  Specifically, petitioner claims that counsel's

9   failure led to the introduction of evidence that petitioner previously was

10  convicted of assaulting his ex-wife Fay Cunningham and that he sexually

11  abused Linda and physically abused Ramona.  (Statement, pp. 41, 44; see also

12  RT 251, 274, 279-80, 284-85.)

13         Failure to object to a prejudicial question can constitute ineffective

14  assistance, Crotts v. Smith, 73 F.3d 861, 864, 866-67 (9th Cir. 1996), but the

15  failure to make meritless objections does not, see United States v. Shah, 878

16  F.2d 1156, 1162 (9th Cir.), cert. denied, 493 U.S. 869 (1989); United States

17  v. Steele, 785 F.2d 743, 750 (9th Cir. 1986).  As the California Court of

18  Appeal held, defense counsel's omission did not constitute ineffective

19  assistance because petitioner opened the door for this otherwise inadmissible

20  testimony by denying on direct examination that he ever abused his daughters

21  and testifying that he would never use force on a woman or anyone, rendering

22  any objection meritless.  (See Pet. Exh. A, pp. 12-13; see also Cal. Evid. Code

23  1101(b), (c).  The state court's analysis and decision are consistent with federal

24  law and are not objectively unreasonable.  Accordingly, this Court does not

25  disturb the state court's decision on this issue.

26  ///

27  ///

28

- 34 -

## VI.

## PROSECUTORIAL MISCONDUCT

Petitioner claims he was deprived of his right to a fair trial when the prosecutor committed misconduct by withholding exculpatory evidence, permitting witnesses to testify to claims which the prosecution knew were false or misleading, and making improper comments about petitioner's demeanor when he was testifying.[12]  (Petition, p. 7.)

Petitioner first claims it was misleading for the prosecution to allow Catherine to testify that petitioner had abused her, without also disclosing that there was evidence in Catherine's medical records that Catherine had been abused, not by petitioner, but by her mother and sister.  (Statement, p. 54.) However, attorney Boche acknowledged at the evidentiary hearing that he had a copy of Catherine's medical records, had read them, and decided not to use them.  (1 Evid. RT 102, 116-18.)  Although a prosecutor may violate due process where he suppresses material exculpatory evidence, <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), no violation occurred here because the defense was in possession of the allegedly withheld evidence, <u>see</u> <u>United States v. Quintanilla</u>, 193 F.3d 1139, 1149 (10th Cir. 1999) (finding no <u>Brady</u> violation where government failed to turn over notes from interview with co-defendant, the substance of which already was known to defendant).

Petitioner also claims that the prosecution improperly argued that because petitioner was calm on the stand when asked about allegations of child

---

[12]  As the State argues, petitioner has not identified the precise evidence the prosecution allegedly withheld.  (Answer, p. 29.)  This Court too has reviewed the Petition, statement, exhibits, and other papers, and cannot determine precisely what evidence petitioner references.  For purposes of this discussion, the Court assumes that petitioner is referring to Catherine's medical records because such conclusion is most reasonable in light of petitioner's claims.

1 molestation, he must be guilty.  (Statement, p. 54; see RT 338-39.)  It is

2 permissible for the prosecutor to argue inferences from the demeanor of the

3 defendant while testifying.  Cf. United States v. Schuler, 813 F.2d 978, 981

4 n.3 (9th Cir. 1987) (when defendant chooses to testify, his or her demeanor is a

5 relevant consideration for jury in evaluating defendant's credibility).

6      Finally, petitioner contends that it was improper for the prosecution to

7 argue that evidence from the crime scene had been kept secret and had not

8 been released to anyone.  (Statement, pp. 53-54.)  Although the 1972 police

9 report notes that evidence of the optical glass was a "very guarded secret" (Pet.

10 Exh. B – 1972 Police Report, p. 20), it also states that petitioner would have

11 had access to "a considerable amount of information regarding the murder and

12 the evidence found at the crime scene . . . ." (Id. at 15).  However, the fact that

13 certain information from the crime scene was not released by police was a

14 permissible inference based on the evidence presented.  Therefore, no

15 misconduct occurred.

16

17 ## VII.

18 ## NEW IMPEACHMENT EVIDENCE

19      Petitioner claims that a declaration of his eldest daughter Linda, prepared

20 after his 1995 trial, proves that several crucial portions of Catherine's

21 testimony, mostly relating to her testimony about abuse, were untruthful.

22 (Petition, p. 7; Statement, pp. 55-56.)  To prevail on a habeas claim based on

23 newly discovered evidence, a habeas petitioner first must show that the

24 evidence "could not reasonably have been presented to the state trier of facts."

25 Townsend v. Sain, 372 U.S. 293, 317, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963),

26 overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1, 4, 112 S.

27 Ct. 1715, 118 L. Ed. 2d 318 (1992).

28      Petitioner does not satisfy the first requirement for a new evidence claim;

1 Linda's statements reasonably could have been presented to the trier of fact.
2 Linda was available for questioning before the trial and was even called as a
3 rebuttal witness by the prosecution.  There is no justification, other than the
4 failure of counsel Boche to adequately investigate the case, for the failure to
5 procure the statements in time for trial.  Habeas relief is not warranted on this
6 claim.

7

8 ## VIII.

9 ## RECOMMENDATION

10      For all of the foregoing reasons, IT IS RECOMMENDED that the Court
11 issue an order: (1) approving and adopting this report and recommendation;
12 and (2) directing that judgment be entered granting the Petition in part and
13 denying the Petition in part.

14

15 DATED: _December 23, 2003_

16

17

18                     JEFFREY W. JOHNSON
                    United States Magistrate Judge

19

20 ## NOTICE

21

22      Reports and Recommendations are not appealable to the Court of
Appeals, but may be subject to the right of any party to file Objections as
23 provided in the Local Rules Governing the Duties of the Magistrate Judges and
review by the District Judge whose initials appear in the docket number.  No
24 Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should
25 be filed until entry of the Judgment of the District Court.

26

27

28

- 37 -